# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| MICHELE PEARSON TUCKER, individually and as administrator of the ESTATE OF CLINTON VONDELL JACKSON, <br><br> Plaintiff, <br><br> v. <br><br> WELLPATH LLC, <br> CENTURION DETENTION HEALTH SERVICES, LLC, <br> LEWANA STREETER, <br> BRIYANA INGRAM, and <br> JADE BANKS, <br><br> Defendants. | Civil Action File No. <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Michele Pearson Tucker, individually and as administrator of the Estate of Clinton Vondell Jackson, files this Complaint under 42 U.S.C. § 1983 and state law, alleging as follows:

## INTRODUCTION

1. In the afternoon hours of October 19, 2022, Clinton Vondell Jackson died while in custody at the Macon State Prison, a Georgia Department of Corrections facility. In an autopsy report, a Georgia Bureau of Investigation medical examiner listed the cause of death as suicide by hanging. At the time of his death, Mr. Jackson was housed in a segregated cell and had been assigned to segregation for nearly a year. <u>Despite the fact that he reported threats of self-harm to prison staff</u>, and despite the dangers of suicide created by long-term segregation, he was left in his segregated cell with items that could be used as hanging devices. He was also unmonitored. Shortly after he threatened self-harm, Mr. Jackson was found hanging from a light fixture in his cell.

2. When prison staff discovered Mr. Jackson hanging from the light fixture, they cut him down and attempted life-saving measures. They were far too late. In fact, a prison nurse who examined Mr. Jackson minutes after he was discovered hanging noted "rigor mortis" to Mr. Jackson's "upper and lower bilateral extremities." <u>The presence of rigor mortis in Mr. Jackson's arms and legs establishes that he had been dead for at least four to six hours, and possibly longer, by the time he was discovered</u>. In the same vein, it shows that staff at Macon State Prison either did not check on Mr. Jackson for at least four to six hours prior to his death, or that they observed his attempts to harm himself and decided not to do anything about it.

3. In this action, Plaintiff alleges that the corporate and individual defendants were negligent and acted with deliberate indifference to a serious risk of harm in violation of the Eighth and Fourteenth Amendments to the United States Constitution. The theories of recovery may overlap and/or be pleaded in the alternative.

**PARTIES**

4. Plaintiff Michele Pearson Tucker is an adult resident citizen of the State of Georgia. She is Mr. Jackson's sister and the administrator of his estate. *See In re Estate of Clinton Vondell Jackson, Deceased*, Probate Court of Clarke County Georgia, Estate No. 23-LA-00012. As Administrator of the Estate of Clinton Vondell Jackson, she has the right to recover the "full value" of Mr. Jackson's life and the right to recover damages for Mr. Jackson's pre-death pain and suffering and funeral expenses.

5. Defendant Wellpath LLC is a foreign limited liability company organized under the laws of the State of Tennessee. Wellpath is licensed to do business in Georgia and is a resident of Cobb County, the location of its registered agent. Wellpath is to be served with process through its registered agent, Corporate Creations Network Inc., 2825 Gordy Parkway, 1st Floor, Marietta,

GA 30066. Wellpath contracted with the State of Georgia to provide medical services in certain Georgia prisons, including Macon State Prison.

6.     Defendant Centurion Detention Health Services, LLC is a foreign limited liability company organized under the laws of the Commonwealth of Virginia. Centurion is licensed to do business in Georgia and is a resident of Gwinnett County, the location of its registered agent. Centurion is to be served with process through its registered agent, CT Corporation System, 289 S. Culver Street, Lawrenceville, GA 30046. Centurion contracts with the State of Georgia to provide mental and other health services in certain Georgia prisons, including Macon State Prison.

7.     Defendant Lewanna Streeter is, and was at all times relevant to this Complaint, an employee of Defendant Centurion. Streeter also worked for the Georgia Department of Corrections. She is sued in her individual capacity. At all times relevant to this Complaint, Streeter acted under the color of law. Streeter is a resident of Houston County, Georgia.

8.     Defendant Jade Banks is, and was at all times relevant to this Complaint, a Georgia Department of Corrections official. She is sued in her individual capacity. At all times relevant to the Complaint, Banks acted under the color of law. Banks is a resident of Sumter County, Georgia.

9.     Defendant Briyana Ingram was a Georgia Department of Corrections official at the time of the events alleged in this Complaint. She is sued in her individual capacity. At all times relevant to the Complaint, Banks acted under the color of law. Ingram is a resident of Macon County, Georgia.

10.     This is a civil and constitutional rights action arising under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction of federal claims under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction of pendent state law claims under 28 U.S.C. § 1337.

11. Venue is proper, pursuant to 28 U.S.C. § 1391 because some of the Defendants reside in this Division and all Defendants reside within Georgia.

**FACTS**

12. It is well documented that the Georgia Department of Corrections (hereinafter "GDC") has allowed unacceptable levels of suicide to occur in its facilities. *See, e.g.*, Danny Robbins and Jennifer Peebles, ATLANTA JOURNAL-CONSTITUTION (May 13, 2022).[1] In fact, data indicates that the rate of suicide in Georgia's prisons is nearly double the national average and among the highest in the nation. *Id.*

13. It is also well established that the use of segregation contributes to the risk of suicide. *See, e.g., Braggs v. Dunn*, 367 F. Supp. 3d 1340, 1344 (M.D. Ala. 2019); *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1094 (E.D. Cal. 2014).

14. Immediately prior to his death, Clinton Vondell Jackson was housed in a segregated cell in the Macon State Prison, a GDC facility in Oglethorpe, Macon County, Georgia. Mr. Jackson was 31 years old and had already served nine years of his ten-year sentence.

15. Mr. Jackson was placed in segregation on or around November 13, 2021. Despite the risks segregation poses to mental health and wellbeing, prison officials kept him in segregation until his death on October 19, 2022.

16. As a matter of common sense and training, correctional officers and medical staff are required to immediately refer any offender who may be suicidal or self-injurious for immediate assessment and treatment.

---

[1] https://www.ajc.com/news/investigations/suicides-of-125-georgia-inmates-point-to-another-crisis-for-state-prisons/VA4IEU3XLVFRBGFD5Y7NLGVHVY/

17. As a matter of common sense and training, correctional officers and mental health staff are required to make a written record of the referral and treatment and to place it in the medical and mental health record.

18. Upon proper referral, the assessment is then used to determine the offender's suicide risk level and the corresponding precautions and interventions required to prevent suicide or self-harm.

19. Such precautions include continuous observation (i.e. a 15-minute watch or constant line-of-sight to a staff member); assignment to a hardened, suicide resistant cell with "recessed" lighting, no functional electrical outlets, and "no grates or knobs that could be used to tie materials to;" and the provision of suicide-resistant bedding.

20. Mr. Jackson was assigned to a tiered segregation unit for which prison staff was required to observe him at approximately half-hour intervals and complete corresponding logs for each observation visit.

21. On October 17, 2022, just two days prior to his death, Mr. Jackson reported to the individual Defendants and medical staff of the corporate Defendants that he was concerned he might harm himself.

22. The individual Defendants believed and understood that Mr. Jackson's threats were sincere.

23. But no one did anything in response to Mr. Jackson's statement that he wanted to kill himself.

24. Mr. Jackson made this threat of self-harm to a Wellpath employee who examined him on October 17, 2022 and who filled out the October 17, 2022 Wellpath Rounding Log. This employee failed to take appropriate action in response to Mr. Jackson's threat of self-harm. This

employee did not refer him for further mental health or medical evaluation, did not take steps to ensure Mr. Jackson was assigned to a cell appropriate for someone displaying a danger of self-harm or suicide, did not take steps to ensure Mr. Jackson was appropriately monitored, and did not take any other action to prevent Mr. Jackson from harming himself.

25. Plaintiff alleges in the alternative that Mr. Jackson made this threat of self-harm to Ingram and Banks, GDC employees who were working at Macon State Prison on October 17, 2022, and who filled out the October 17 Wellpath Rounding Log. Ingram and Banks failed to take appropriate action. They did not refer Mr. Jackson for further mental health or medical evaluation, did not take steps to ensure Mr. Jackson was assigned to a cell appropriate for someone displaying a danger of self-harm or suicide, did not take steps to ensure Mr. Jackson was appropriately monitored, and did not take any other action to prevent Mr. Jackson from harming himself.

26. Defendant Lewana Streeter, an employee of Defendant Centurion, was the Mental Health Unit Manager for the Macon State Prison unit to which Mr. Jackson was assigned at the time of his death. Streeter was directly responsible for Mr. Jackson's care.

27. Streeter knew that Mr. Jackson had expressed threats of self-harm shortly before his death on October 19, 2022.

28. Mr. Jackson told Streeter he was suicidal face to face.

29. Alternatively, Streeter was told by others that Mr. Jackson was sincerely suicidal.

30. Despite her actual knowledge of the danger to Mr. Jackson, Ms. Streeter failed to take appropriate action. She did not refer Mr. Jackson for further mental health or medical evaluation, did not take steps to ensure Mr. Jackson was assigned to a cell appropriate for men who display a danger of self-harm or suicide, did not take steps to ensure Mr. Jackson was

appropriately monitored, and did not take any other action to prevent Mr. Jackson from harming himself.

31.     In an apparent attempt to cover for herself, Streeter filled out a "Restrictive Housing Rounds" form dated October 20, 2022, <u>the day after Mr. Jackson died</u>, indicating that she had assessed him on that date.  In the comment section, unprompted, Streeter wrote "denied any self-harm or suicidal thoughts."

32.     Streeter's actions in filling out a form the day after Mr. Jackson died and specifically adding that he denied any thoughts of self-harm shows a willingness to falsify evidence and consciousness of guilt.

33.     Following Mr. Jackson's threat of self-harm, he was not otherwise referred by any GDC, Centurion, or Wellpath employee for mental health or medical services, and no other action was taken to prevent him from harming himself.

34.     No Defendant did anything in response to their actual knowledge that Mr. Jackson wanted to, and could, take his own life.

35.     Had any Defendant taken even minimal precautions, Mr. Jackson would still be alive.

36.     Instead, Mr. Jackson was kept in his segregated cell.  In that cell was both a light fixture and a bedsheet capable of being used to fashion a ligature.

37.     Worse, than doing nothing, Mr. Jackson was also left unmonitored for hours on end, in direct contravention of policy and commonsense.

38.     Defendants Ingram and Banks were correctional officers assigned to Mr. Jackson's unit on October 19, 2022.

39. As officers assigned to Mr. Jackson's unit on October 19, 2022, Defendants Ingram and Banks were required to make observation rounds in approximately half-hour intervals on that date.

40. At approximately 2:15 p.m. on October 19, 2022, prison staff found Mr. Jackson hanging from the light fixture by his bedsheet, which he had used as a ligature. He was unresponsive.

41. After they found Mr. Jackson, they cut him down from the light fixture and attempted to administer medical treatment. Their efforts were unsuccessful. Mr. Jackson was pronounced dead later that afternoon.

42. A nurse who arrived on the scene within minutes of the discovery of Mr. Jackson hanging from the light fixture noted "rigor mortis" in Mr. Jackson's "upper and lower bilateral extremities."

43. Rigor mortis does not appear in the arms and legs of a human body until at least four to six hours after death.

44. Thus, Mr. Jackson was hanging in his cell for at least four to six hours before prison officials discovered him after Ingram and Banks knew that Mr. Jackson was suicidal.

45. Defendants Ingram and Banks failed to performed the required rounds every half-hour and in fact let multiple hours without checking on Mr. Jackson, despite knowing he was suicidal.

46. Alternatively, Ingram and Banks observed Mr. Jackson's attempt to take his own life and did nothing about it.

47. In the days after Mr. Jackson died, GDC officials stonewalled his family and refused to provide them with any information about the cause or even the fact of death. Plaintiff

and Mr. Jackson's mother ultimately learned that he had died not from the Warden or any other official at Macon State Prison, but through independent channels.

48. The Defendants created false records showing that Plaintiff was fine even after he was dead.

49. GDC officials have steadfastly refused to provide Plaintiff with key information about Mr. Jackson's death or even Mr. Jackson himself.

50. GDC officials have also indicated that GDC has spoliated the observation logs that would have provided information about when (or if) Mr. Jackson was observed in the hours leading up to his death.

**COUNT ONE**
*Deliberate Indifference under the Eighth*
*and/or Fourteenth Amendments 42 U.S.C. § 1983*
**(against all Defendants)**

51. Mr. Jackson's sincere threats of self-harm established a strong likelihood that he would attempt to harm himself and/or take his own life.

52. This was an objectively serious danger.

53. Each of the individual Defendants, to include Streeter, Ingram, and Banks subjectively knew that Mr. Jackson was a real suicide risk.

54. None of them did anything at all.

55. As a result of their lack of action, and dereliction of duty in the face of obviously grave risks, Mr. Jackson suffered and died.

56. Streeter, Ingram, and Banks are not entitled to qualified immunity because they acted with the mental state necessary to violate the Eighth Amendment and because Streeter is a private person. *See, e.g., Richardson v. McKnight*, 521 U.S. 399, 412 (1997) (concluding that although prison guards employed by a private contractor are subject to § 1983 claims, they are not

entitled to qualified immunity); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994), *overruled on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002) ("'A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.'"). Streeter is additionally disentitled to qualified immunity as a private employee.

57. The corporate Defendants, Wellstar and Centurion, had a pattern and practice of turning a blind eye to their patients in prison.

58. The corporate Defendants' contracts with the GDC create an improper financial motive to provide as little healthcare as possible.

59. The corporate Defendants are paid a fixed rate per incarcerated person per day.

60. The less healthcare they provide, the more they profit. The more staff they pay and the more services they render, the more they lose money.

61. This financial structure results in a policy and custom of cost containment.

62. Furthermore, Wellpath and Centurion are adverse to each other in fundamental and material ways. *Cf. Wellpath, LLC v. Oliver, et al.* No. 24CV005909 (Fulton Super. Ct. 2024) (suit by Wellpath against Centurion and others).

63. Wellpath believes that Centurion has "sabotaged" it for financial gain.

64. Wellpath has a direct financial motive for Centurion to provide services instead of them, and Centurion has a direct financial motive for Wellpath to provide services instead of them. Both corporate Defendants acted pursuant to this motive to not provide care as a policy and custom of cost containment.

65. Wellpath abdicated its responsibility to act to protect Mr. Jackson because it hoped Centurion would act to save money. And Centurion abdicated its responsibility to act to protect Mr. Jackson because it hoped Wellpath would act to save money.

66. As a result of these improper financial motivations, the corporate Defendants

   a. commonly disregard reports by patients of objectively serious symptoms;

   b. refuse to provide adequate treatment to patients;

   c. refuse to timely conduct evaluations for patients or comply with referrals to specialists;

   d. fail to create sensible treatment plans for patients whose health status requires the same;

   e. fail to ensure continuity of care;

   f. prioritize profits at the expense of constitutionally adequate care;

   g. fail or refuse to arrange for incarcerated men to be treated in outside facilities, even when an outside referral is necessary or proper; and

   h. refuse and/or fail to provide any medical care whatsoever for defined medical problems.

67. The corporate Defendants also have a practice and custom with regard to records that regularly causes delays and denials of necessary treatment.

68. The forms used for mental health rounding do not require the responsible medical professional completing any evaluation to identify themselves.

69. The forms do not require a referral in the event someone expresses suicidal ideation.

70. These forms facilitate unaccountability and frustrate continuity of care, rather than protecting patients.

71. As a result, nothing happened in response to an expression of suicidal ideation.

72. Wellpath also had a pattern, practice, and custom of understaffing at its facilities in the GDC at this time.

73. Wellpath acknowledged that conditions within GDC caused it to be more difficult to hire and retain appropriate staff.

74. Instead of sufficiently increasing pay to ensure proper staff, Wellpath fought with GDC and Centurion for more resources.

75. Centurion delegated final policymaking authority for the provision of mental health care at Macon State Prison to Defendant Streeter.

76. There was no higher up that could meaningfully review Streeter's actions or inactions with respect to Mr. Jackson.

77. Centurion, via Streeter, failed to take any action with respect to Mr. Jackson, other than falsifying records to cover up their misdeeds.

78. In response to the failures in treatment leading directly to Mr. Jackson's death, neither corporate Defendant took any remedial action, evincing that their personnel acted pursuant to training, policy, and custom.

79. As a direct result of the corporate Defendants' systematic actions and inactions, suicides and deaths from other forms of medical neglect skyrocketed in the years preceding Mr. Jackson's death.

80. The corporate Defendants took no action, or took grossly inadequate action, in response to this explosion of deaths from their neglect.

**COUNT TWO**
*Negligence and Respondeat Superior/Vicarious Liability for Negligence*
**(against Defendants Wellpath, Centurion, and Streeter)**

81. At all times relevant to this Complaint, Wellpath employees and Centurion employee Streeter were acting within the course and scope of their employment with Defendants Wellpath and Centurion.

82. While working during the times relevant to this Complaint, these employees were furthering the commercial interests of Defendants Wellpath and Centurion.

83. While working during the times relevant to this Complaint, these employees were working at the request and direction of Defendants Wellpath and Centurion.

84. Defendants Wellpath and Centurion are responsible for the negligence of these employees under the doctrine of respondeat superior.

85. Defendants Wellpath, Centurion, and Streeter failed to take reasonable actions to protect Mr. Jackson from harm after he expressed suicidal ideation.

86. As a result, Mr. Jackson died.

## COUNT THREE
*Expenses of Litigation under O.C.G.A. § 13-6-11*
**(against all Defendants)**

87. Plaintiff is entitled to recover expenses personally of litigation under O.C.G.A. § 13-6-11 because Defendants have acted in bad faith, been stubbornly litigious, and caused Plaintiff unnecessary trouble and expense.

## COUNT FOUR
*Punitive Damages*
**(against all Defendants)**

88. By engaging in the above-described conduct, the Individual Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences so as to entitle

Plaintiff to punitive damages pursuant to O.C.G.A. § 51-12-5.1 and 42 U.S.C. § 1983. Defendants Wellpath and Centurion are liable for any punitive damages assessed against their employees.

WHEREFORE, Plaintiff prays:

a) That this Complaint be filed and summonses be issued as provided by law;

b) That Plaintiff be awarded damages;

c) That Plaintiff be awarded attorney fees and other costs of litigation, pursuant to *e.g.*, O.C.G.A. § 13-6-11 and 42 U.S.C. § 1988;

d) That Plaintiff be awarded punitive damages;

e) That all costs of this action be cast upon the Defendants; and

f) That Plaintiff receive such other and further relief as the Court deems just and proper.

Respectfully submitted this the 3rd day of July 2024.

**BROOKS INJURY LAW, LLC**

*/s/ Natanya H. Brooks*
Natanya H. Brooks
Georgia Bar No. 341039
Morgyn L. Graber
Georgia Bar No. 334671
William H. Fowler
Georgia Bar No. 840696

3740 Davinci Court, #150
Peachtree Corners, GA 30092
Phone: 678-813.-2202
Fax: 678-813-2176
nhb@brooksinjurylaw.com
mlg@brooksinjurylaw.com
whf@brooksinjurylaw.com

**MITCHELL SHAPIRO GREENAMYRE & FUNT LLP**

*/s/ Zack Greenamyre*

Georgia Bar No. 293002

881 Piedmont Avenue
Atlanta, GA 30309
Phone: 404-812-4747
Fax: 404-812-4740
zack@mitchellshapiro.com